**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Criminal No. 18-1 |
| | ) | Judge Nora Barry Fischer |
| JAMES FOLKS, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

## I.    INTRODUCTION

In this case, Defendant James Folks is charged with one count of attempt to possess with intent to distribute 100 grams or more of methoxyacetyl fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(vi) and possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1). (Docket No. 11). Presently before the Court is a motion to suppress evidence filed by the Defendant and the Government's opposition thereto.    (Docket Nos. 47; 50). Specifically, Defendant seeks suppression of the methoxyacetyl fentanyl seized by law enforcement in an international mail package shipped to him from South Korea, statements he made upon his arrest, and drug paraphernalia and a firearm seized upon the search of his residence. (Docket No. 47; 70). The Court held a suppression hearing on November 19, 2019, the official transcript of which was filed on December 20, 2019.   (Docket Nos. 57; 59).   The Government filed its proposed findings of fact and conclusions of law on January 3, 2020, and after receiving several extensions from the Court, Defendant made his submission of same on February 28, 2020. (Docket Nos. 61; 70).   The parties declined to submit any responses by the Court's deadline of March 6, 2020, at which time the Court took the matter under advisement.   (Docket Nos. 67). After careful consideration of the parties' filings and the credible evidence of record, and for the

following reasons, Defendant's Motion to Suppress [47] is denied.

II.     BACKGROUND

At the hearing, the Government presented the testimony of U.S. Postal Inspector Steven Celletti and introduced a photograph of the international mail parcel as an exhibit.   (Docket No. 59; Govt. Ex. 1).   Defendant did not call any witnesses and instead relied upon cross-examination of Inspector Celletti.   (Docket No. 59).   The two warrants issued by U.S. Magistrate Judge Maureen P. Kelly including a Tracking Warrant dated December 6, 2017 and a Search Warrant for Defendant's residence and vehicle dated December 7, 2017 were also made part of the record. (Def. Ex. 1; Docket No. 50-1).   In this Court's opinion, Inspector Celletti offered credible testimony concerning the events in question, despite efforts to impeach him.   *See United States v. Garcia,* 521 F. App'x 71, 73 (3d Cir. 2013) (quoting *Anderson v. City of Bessemer,* 470 U.S. 564, 574 (1985)) ("'[w]hen findings are based on determinations regarding the credibility of witnesses ... for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said.'").   He also presented as an experienced law enforcement officer and investigator.

To this end, Inspector Celletti is a college graduate who joined the U.S. Postal Service after a few years of private employment.   (Docket No. 59 at 74).   He initially started as a mail carrier but completed a 14-week training course to become a postal inspector in 2004, a position he has held for the past 15 years.   (*Id.*).   For the first year, Inspector Celletti was assigned to the Cleveland office where he worked on internal theft cases but then transitioned to narcotics and money laundering and transferred to the Pittsburgh office near the end of 2007.   (*Id.*). He now has extensive experience investigating narcotics and money laundering facilitated through the use of

the United States mail, serving as case agent for many cases in this District. (*Id*. at 6-7). Inspector Celletti told the Court he has learned through his experience that Southeast Asia is a known source location for the production of fentanyl and fentanyl-related controlled substances imported into the United States. (*Id*. at 16). He further explained that illegal fentanyl production largely takes place in China but as parcels from that country have become a focus of law enforcement efforts to interdict packages, oftentimes traffickers will send them to another location, such as South Korea, to have them imported into the United States with less scrutiny. (*Id*. at 77).

Inspector Celletti is the case agent for the investigation and prosecution of Defendant and is a part of a team that also includes law enforcement officers from the Department of Homeland Security/Homeland Security Investigations ("DHS/HSI"); the United States Postal Investigation Service ("USPIS"); the Pennsylvania Attorney General's Office ("PAAG"); and the Pennsylvania State Police ("PSP"). (Docket No. 59 at 7). Among others on the team, PSP Trooper Dave Williams and DHS Agent Christopher McKelvy played significant roles. (*Id*. at 6-7, 17-18).

During late summer/early fall 2017, the investigative team received several credible leads linking Defendant to fentanyl trafficking. (Docket No. 59 at 7-11). In August of 2017, Inspector Celletti was told by a PSP Trooper that a known informant advised him that Defendant was receiving fentanyl in the mail. (*Id*. at 7-8). A month later, DHS personnel in New York City intercepted an international mail parcel addressed to Defendant which was searched and contained a white powdery substance that tested positive as a form of fentanyl. (*Id*. at 9). In November of 2017, the investigative team received information that another known informant had told the PAAG that Defendant was due to receive additional fentanyl through the mail in late November or

3

early December of 2017. (*Id*. at 9). The team also conducted an investigation of Defendant and learned all of the following: that he had several prior convictions for drug crimes; he lived at a residence on Ridge Avenue in East Pittsburgh, Pennsylvania; and also had a P.O. Box at the Homestead, Pennsylvania Post Office. (*Id*. at 10-12). After considering all of this information, Inspector Celletti placed a parcel watch with the Postal Service System on any addresses known to be used by Defendant which would alert Inspector Celletti by email of any parcels within 24-48 hours of delivery to Defendant. (*Id*. at 10-12).

On December 5, 2017, Inspector Celletti received an alert that an international mail parcel addressed to Defendant at his P.O. Box in Homestead was scheduled to arrive in Pittsburgh the next day. (Docket No. 59 at 11-12). The parcel was shipped from South Korea to Pittsburgh through J.F.K. International Airport in New York, and its origin in Southeast Asia raised Inspector Celletti's suspicion that it contained fentanyl. (*Id*. at 12). The investigative team decided to have Homeland Security conduct a border search of the parcel in Pittsburgh, rather than New York, so that they could further investigate Defendant's involvement in fentanyl trafficking. (*Id*. at 12-13). When the parcel arrived at the Postal Service's North Side distribution facility on the morning of December 6, 2017, Inspector Celletti retrieved it and brought it directly to the U.S. Postal Inspection Service Pittsburgh Office in Robinson Township, where Agent McKelvy of DHS/HIS and Trooper Williams joined him. (*Id*. at 12-14). The parcel had not yet cleared customs and was not opened at this time. (*Id*. at 13, 18).

Inspector Celletti described the parcel as approximately 10 to 12 inches long and 8 to 9 inches wide. (Docket No. 59 at 15). The entire box was wrapped in black paper and heavily taped so that the cardboard was not visible. (*Id*. at 16). The Korea Post/United States Postal

Service shipping label states that it is from "Tel: 82-2-2662-8851"; "Zhirong Koreanair Cargo Terminal"; Zip 22381; "Rep. of Korea"; and also contains a reference to "China." (Gov. Ex. 1; Def. Ex. 1). The parcel is addressed to: James Folks, P.O. Box 591, Homestead, Pennsylvania 15120, United States of America. (*Id*.). The associated customs declaration claims that the contents of the package are "warm clothing" with a weight of 1273 grams and a value of $10.00 U.S. currency. (*Id*.). Inspector Celletti explained that a stamp on the bottom of the shipping label indicated that it was placed in the mail in South Korea on November 19, 2017 and to be delivered to the United States through J.F.K. International Airport, a process which he explained can take 10-15 days. (Docket No. 59 at 77-78).

The parcel was taken to a ventilated room within the office which is specially designed for opening these types of parcels and Inspector Celletti, Agent McKelvy and Trooper Williams put on gloves and masks to protect themselves from exposure to potentially harmful chemicals. (Docket No. 59 at 45; 76). Agent McKelvy then exercised his authority as a Homeland Security Agent and conducted a border search of the parcel. (*Id*. at 17-18). Upon opening the parcel, the law enforcement officers all observed that the parcel contained approximately 1 kilogram of a white powdery substance. (*Id*. at 18-19). Trooper Williams utilized a TruNarc device to field test the substance. (*Id*.). Inspector Celletti explained that a TruNarc is a handheld mechanical scanning device which can be used by law enforcement to field test narcotics by scanning the substance. (*Id*. at 18-19). The device maintains a library of controlled substances and will alert if the material scanned contains one of the controlled substances in the library. (*Id*.). The device will work through glass or clear plastic but not through cardboard or black paper. (*Id*. at 44-45). He testified that the TruNarc device does not need to be calibrated and can be used by pointing it at

the suspected controlled substance and scanning.   (*Id.* at 46).

The TruNarc device also generates scan reports which can be printed.   (Def. Ex. 1).
Those reports indicate that Trooper Williams conducted three scans on December 7, 2017
identified as Scans 463, 464 and 465 between 1:52 p.m. and 1:55 p.m.   (*Id.*).   Inspector Celletti
could not explain why the report contained incorrect dates and times since the scans were run on
the morning of December 6, 2017.   (Docket No. 59 at 71-72).   The scan results for Scans 463 and
465 state "Self Check Passed" and the scan result for Scan 464 indicates "Butyryl Fentanyl."
(Def. Ex. 1). From this information, the law enforcement officers determined that the substance
they tested was a controlled substance and fentanyl powder.   (Docket No. 59 at 19).

The package was secured and the next step in the investigative process involved Inspector
Celletti working with the U.S. Attorney's Office to submit an Application and Affidavit in support
of a Tracking Warrant so that they could install GPS tracking and hornet beeper devices to track
the package in real time during a controlled delivery and to receive an alert when it was opened.
(Docket No. 59 at 19-20; Def. Ex. 1).   In the supporting affidavit, Inspector Celletti provided his
significant experience investigating narcotics cases and details about the investigation including
all of the following: PSP informed him that Defendant was expecting a delivery of fentanyl
through the international mail; a package addressed to him was interdicted on December 6, 2017;
Defendant owned the P.O. Box listed on the shipping label; the origin of the package was
Southeast Asia, a known location for the importation of fentanyl; Homeland Security had opened
the parcel in a controlled environment; a TruNarc device was used and determined that the parcel
contained butyryl fentanyl which is a controlled substance; the substance weighed 1,058 grams;
and they intended to conduct a controlled delivery of the package after inserting a sham substance

in place of the suspected narcotics. (Def. Ex. 1 at ¶¶ 1-12). He also stated that "[t]he TruNarc device has been proven reliable in identifying the presence of controlled substances on several occasions this year in this district." (*Id*. at ¶ 10). The shipping label and TruNarc scan report were attached to the affidavit and also presented to the Court. (Def. Ex. 1). Based upon this information, U.S. Magistrate Judge Maureen P. Kelly issued a Tracking Warrant on December 6, 2017 at 5:15 p.m. and an accompanying Order, which authorized the use of the GPS tracking and hornet beeper devices. (*Id*.).

The next morning, Inspector Celletti returned to the office and "shammed" the parcel by removing the narcotics and substituting another non-controlled substance similar in weight and appearance. (Docket No. 59 at 19-20). He also placed the GPS tracking and hornet beeper devices into the parcel. (*Id*. at 20). After completing these tasks, Inspector Celletti took the package to the Homestead Post Office to be placed into the mail system for delivery. The staff at the post office placed a slip in the post office box because the package was too large to fit into the smaller box. (*Id*. at 21-22). The investigative team then set up physical surveillance inside and outside the Homestead Post Office. (*Id*. at 22). At approximately 8:45 a.m., Defendant arrived at the Homestead Post Office, retrieved the slip from his post office box and presented it at the counter to a U.S. Postal Service employee, who provided him with the parcel. (*Id*. at 22-23).

Defendant left the Homestead Post Office with the parcel and drove away in his Jeep Cherokee toward his house. (Docket No. 59 at 23-24, 75). He was followed by several members of the investigative team in separate vehicles. (*Id*.). Defendant stopped briefly at a gas station and stepped out of the vehicle but the parcel remained in the Jeep. (*Id*. at 24). He then re-entered the vehicle and drove the rest of the way to his house in East Pittsburgh, with the total trip taking

between 20-25 minutes.   (*Id*. at 24-25). During the drive, the beeper device was triggered, alerting law enforcement that Defendant had opened the parcel.   (*Id*. at 25). Defendant parked the Jeep in front of his house but remained in the vehicle for a few minutes.   (*Id*.).   He was then surrounded by members of the investigative team and placed under arrest.   (*Id*. at 25).   The parcel was observed in plain view on the front passenger seat. (*Id*.).   There were between 15-20 law enforcement officers at the scene, many of whom had firearms drawn.   (*Id*. at 62).   Inspector Celletti did not see the exchange but one of the officers obtained Defendant's house keys from him.   (*Id*. at 32, 62, 65).   After the arrest, Inspector Celletti approached and escorted Defendant to a nearby USPIS vehicle.   (*Id*. at 26).

Inspector Celletti credibly explained his interactions with Defendant in the USPIS vehicle. (Docket No. 59 at 27-30; 61-66).   In this regard, he read Defendant his *Miranda* rights and despite the instructions that he had a right to remain silent, that anything he said would be used against him and that he had a right to speak to a lawyer prior to speaking to them, Defendant voluntarily proceeded to have a brief conversation with Inspector Celletti which was observed by two other law enforcement officers. (*Id*. at 26-28).   Inspector Celletti confirmed that Defendant was not threatened; no guns were brandished at him; and he exhibited no signs of being under the influence or any mental infirmity.   (*Id*. at 28-29, 70).   During the conversation, Defendant admitted that he knew the parcel contained an analogue of fentanyl but claimed it was for personal use.   (Govt. Ex. 1).   The questioning ceased immediately upon Defendant requesting a lawyer.   (Docket No. 59 at 28).   Around the same time, other members of the investigative team from the Attorney General's Office S.W.A.T. conducted a protective sweep of the residence for officer safety and to ensure that no one inside could destroy any evidence.   (*Id*. at 29-30, 63).   The protective sweep

lasted a few minutes, no one was found inside and did not result in the seizure of any evidence from the residence. (*Id*. at 31-32).

Inspector Celletti transported Defendant to the U.S. Courthouse for processing while other officers remained on scene to secure the residence and maintain the status quo. (Docket No. 59 at 31-32). Once again, he consulted with the U.S. Attorney's Office and an Application and Affidavit supporting a criminal complaint against Defendant and search warrants for his residence and vehicle were prepared and presented to Magistrate Judge Kelly. (*Id*.). Inspector Celletti's affidavit supporting probable cause is similar to the one submitted the day before but contains additional details concerning Defendant's criminal history, including an attached printout detailing his prior state convictions, information about the search locations and linking him to same as well as the surveillance activities of the morning of December 7, 2017 leading up to Defendant's arrest. (Docket No. 50-1). Relevant here, the affidavit contains the same statements that "[t]he TruNarc device has been proven reliable in identifying the presence of controlled substances on several occasions this year in this district" and that the TruNarc device indicated that the substance was butyryl fentanyl. (*Id*.). He also added the following:

> Folks was promptly informed of his Miranda rights. I then had a conversation with Folks about what was in the parcel. During the conversation, Folks admitted that he knew the parcel contained an "analogue" of "fentanyl". Folks claimed that he possessed the large quantity of the fentanyl analogue for personal use.

> During the arrest processing of Folks, law enforcement officers entered the search location for the purpose of securing it and maintaining the status quo while a search warrant was applied for. Folks provided the key to the search location to facilitate the entry. Law enforcement officers have also maintained control of the search vehicle pending the issuance of a search warrant.

(*Id*.).   Magistrate Judge Kelly found that the Government demonstrated probable cause to search both locations and issued the search warrant at 2:05 p.m. on December 7, 2017.  (*Id*.).   The Criminal Complaint was also authorized charging Defendant with one count of attempt to possess with intent to distribute butyryl fentanyl, a Schedule I controlled substance, in violation of 21 U.S.C. § 846, on or about December 7, 2017.   (Docket No. 1).

A special team of law enforcement officers trained in gathering evidence from hazardous locations such as meth labs and others expected to contain fentanyl and other deadly powders conducted the search of the residence authorized by the warrant.   (*Id*. at 31).   The evidence seized during the execution of the search warrant included a .40 caliber Smith & Wesson Pistol and drug trafficking paraphernalia.   (*See* Docket No. 47 at 2; *see also* Search Warrant Inventory, MJ. No. 17-1536, Docket No. 2).

Inspector Celletti explained that subsequent laboratory testing on the substance recovered from the parcel indicated that it was methoxyacetyl fentanyl and not butyryl fentanyl.   (Docket No. 59 at 49).   He could not explain why the TruNarc results showed a different type of fentanyl analogue than the laboratory tests.   (*Id*. at 72).   The laboratory test results were not introduced into the record and it was not specified when they were received.   However, the January 3, 2018 Indictment returned by the grand jury charged Defendant with one count of attempt to possess with intent to distribute 100 grams or more of methoxyacetyl fentanyl, a Schedule I controlled substance and an analogue of fentanyl, in violation of 21 U.S.C. § 846, on or about December 7, 2017.   (Docket No. 10).   No further evidence was presented concerning the chemical differences between the two substances.   The Indictment also charged Defendant with one count of felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1), based upon the seizure of the firearm

during the execution of the search warrant and his prior convictions listed therein, including: two robbery convictions in violation of 18 P.S. § 3701(a)(1)(i); two narcotics convictions under 35 P.S. § 780-113(a)(30); and prior federal convictions for conspiracy and theft of a firearm from a licensed firearms dealer, in violation of 18 U.S.C. §§ 371 and 922(u).   (Docket No. 10).

As noted, the Court accepted pre-hearing briefing on Defendant's motion; convened a motion hearing; secured the official transcript; and reviewed the parties' proposed findings of fact and conclusions of law.   (Docket Nos.47; 50; 59; 61; 70).   Since the motion is now fully briefed and argued, it is ripe for disposition.

III.    LEGAL STANDARD

It is well-settled that, at a hearing on a motion to suppress, "the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge." *United States v. Richardson*, 501 F. Supp. 2d 724, 734 (W.D. Pa. 2007) (citations omitted). The trial judge is in the best position to observe the demeanor and tone of testifying witnesses and to evaluate credibility of their testimony.   *See Garcia,* 521 F. App'x at 73.

IV.    DISCUSSION

Defendant initially moved to suppress all evidence seized during warrantless searches and seizures of evidence from the international mail parcel and his residence as well as statements he made to law enforcement allegedly in violation of his rights secured by the Fourth and Fifth Amendments, respectively.   (Docket No. 47).   In his Proposed Findings of Fact and Conclusions of Law, he has not carried forward his arguments challenging the warrantless search of the international parcel and instead claims that the evidence from the hearing demonstrates that the

warrants issued by Magistrate Judge Kelly lacked probable cause; that the protective sweep was unreasonably conducted in violation of his Fourth Amendment rights; and continues to assert that the statements were taken from him in violation of his rights under *Mirada* and the Fifth Amendment. (Docket No. 70). The Government counters that none of the evidence in this case should be suppressed because the physical evidence was lawfully seized and Defendant's statements were voluntarily made after he knowingly waived his *Miranda* rights. (Docket Nos. 50; 61). Having considered the parties' arguments, the Court agrees with the Government's position and denies the suppression motion filed by the defense.

### A. Fourth Amendment Challenges

The Court initially turns to the asserted Fourth Amendment violations, starting with Defendant's position that his rights were infringed by warrantless searches and seizures and will then address his newly raised challenges to the probable cause finding supporting the warrants issued by Magistrate Judge Kelly.

### 1. Warrantless Searches

The Fourth Amendment provides, in pertinent part, that people have the right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. AMEND. IV. Generally, the Fourth Amendment mandates that government officials must establish probable cause and obtain a warrant prior to conducting a search or seizure. *Id.* ("no Warrants shall issue, but upon probable cause"). Warrantless searches and seizures are per se unreasonable subject only to a few specifically established and well delineated exceptions. *Horton v. California*, 496 U.S. 128, 133 (1990). The burden is on the Government to prove by a preponderance of the evidence that warrantless searches and seizures fall within one of the

recognized exceptions to the warrant requirement. *United States v. Herrold*, 962 F.2d 1131, 1137 (3d Cir. 1992). One such exception to the warrant requirement is a border search effectuated by authorized agents of the Department of Homeland Security. *See e.g., United States v. Baxter*, 951 F.3d 128 (3d Cir. 2020). Another exception is a protective sweep of a home based upon reasonable suspicion that an individual posing a danger to law enforcement may be in the area searched. *See e.g., United States v. White*, 748 F.3d 507, 511 (3d Cir. 2014) (citing *Maryland v. Buie*, 494 U.S. 325 (1990)). Any evidence obtained pursuant to a warrantless search that does not meet a recognized exception to the warrant requirement must be suppressed as "fruit of the poisonous tree." *United States v. Brown*, 448 F.3d 239, 244 (3d Cir. 2006) (citing *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963)).

Despite initially challenging the search of the international parcel and seizure of the fentanyl analogue from same, Defendant has not pressed forward with such arguments in his post-hearing supplemental briefing. (Docket Nos. 47; 70). The Government has consistently maintained that the search and seizure of the international parcel were a validly executed border search conducted by an authorized representative of the Department of Homeland Security. (Docket Nos. 50; 61). Although Defendant has arguably abandoned such claim, the Court finds that the Government demonstrated by a preponderance of the evidence that the search of the international parcel and seizure of the fentanyl analogue were reasonable and did not infringe upon Defendant's Fourth Amendment rights.

As the Court of Appeals recently recognized, the Government has historically been provided broad powers to conduct border searches as the same are "necessary to prevent smuggling and to prevent prohibited articles from entering the country." *Baxter*, 951 F.3d at 133

(quotation omitted).  Pursuant to the border search exception, "routine warrantless searches without probable cause," of parcels entering the country are reasonable if they are conducted at the international boundary "or its functional equivalent."  *Id.* (quoting *United States v. Hyde*, 37 F.3d 116, 120 (3d Cir. 1994)).   An "extended border search" of an international package at a location beyond the functional equivalent of the border may also be conducted upon reasonable suspicion that it contains contraband.  *See United States v. Caminos*, 770 F.2d 361, 364-65 (3d Cir. 1985). In this context, the Court of Appeals has held that a search conducted by customs agents of a package at Pittsburgh International Airport which had traveled across the border and then through several U.S. cities but was still under customs bond and had not yet been delivered to the addressee constituted a lawful border search.   *See id.* at 365; *see also Baxter*, 951 F.3d at 133, n.10 (noting that an airport may be the functional equivalent of the border).   Hence, a finding of reasonable suspicion was not required to justify the warrantless search at that location since it was the functional equivalent of the border.  *Id.*

The same is true here.   The credible evidence presented at the hearing plainly established that the parcel crossed the U.S. border as it traveled from Southeast Asia on an international flight to J.F.K International Airport and was then transported to the Pittsburgh area.   (Def. Ex. 1; Govt. Ex. 1; Docket No. 59 at 12).   The parcel was picked up by Inspector Celletti on December 6, 2017 prior to it passing customs and before it was delivered to Defendant.   (Docket No. 59 at 12-14). A border search was then conducted by an individual who is authorized to conduct border searches of international packages, i.e., Agent McKelvy of the Department of Homeland Security.   (*Id.* at 17-18).   Based on these facts and the prevailing precedent, the Court concludes that the USPIS Office in Robinson constituted the "functional equivalent" of the border and the warrantless search

of the international parcel at that location was reasonable. *See Baxter*, 951 F.3d at 133, n.10.

The Court also agrees with the Government's alternative position that Agent McKelvy and the investigative team, including Inspector Celletti and Trooper Williams, had reasonable suspicion that the international parcel contained contraband such that their activities were reasonable to the extent that the search constituted an "extended border search."

> Reasonable suspicion, while not rigidly defined, may be the result of the following factors: "specialized knowledge and investigative inferences," "personal observation of suspicious behavior," "information from sources that prove to be reliable, and information from sources that-while unknown to the police-prove by the accuracy and intimacy of the information provided to be reliable at least as to the details contained within that tip." *Brown*, 448 F.3d at 247 (citation omitted). Depending upon the totality of the circumstances, reasonable suspicion may be the result of one or a combination of the above and other relevant factors. *Id.*

> In evaluating the officer's actions, the Court must defer to the "officer's knowledge of the nature and nuances of the type of criminal activity the officer has observed." *United States v. Robertson*, 305 F.3d 164, 166 (3d Cir. 2002) (citing *United States v. Nelson*, 284 F.3d 472 (3d Cir. 2002)). In addition, the United States Court of Appeals for the Third Circuit gives considerable deference to police officers' determinations of reasonable suspicion. *See, e.g., Nelson*, 284 F.3d at 482. Similarly, courts often defer to personal observations and conclusions on the theory that experienced officers can infer criminal activity from conduct that may seem innocuous to a lay person. *United States v. Arvizu*, 534 U.S. 266, 273 (2002); *see also* [*Illinois v. Wardlow*, 528 U.S. 119, 124 (2000)].

> The Third Circuit has applied the so-called "'collective knowledge doctrine'—under which the knowledge of one law enforcement officer is imputed to the officer who actually conducted the seizure, search, or arrest," *United States v. Whitfield*, 634 F.3d 741, 745 (3d Cir. 2010), in various circumstances, including reasonable suspicion to conduct a *Terry* stop and frisk, *id.*; probable cause for a warrantless arrest, *see United States v. Belle*, 593 F.2d 487, 497, n.15 (3d Cir. 1979); and, seizures under the plain view doctrine, *see United States v. Menon*, 24 F.3d 550, 562 (3d Cir. 1994). The

collective knowledge doctrine allows officers "'to act on the strength' of work done by fellow officers" when they are engaged in joint law enforcement activities. *United States v. Gonzalez*, 630 F. App'x. 157, 161 (3d Cir. 2015) (quoting *Whiteley v. Warden*, 401 U.S. 560, 568 (1971)). "Under the rule, determinations concerning the existence of reasonable suspicion can be made based on the knowledge of the officer conveying the information, not on 'whether those relying on the [information] were themselves aware of the specific facts which led their colleagues to seek their assistance.'" *Gonzalez*, 630 F. App'x. at 161 (quoting *United States v. Hensley*, 469 U.S. 221, 231 (1985)).

*United States v. Gardenhire*, Cr. No. 15-87, 2017 WL 1022578, at *4-5 (W.D. Pa. Mar. 16, 2017).

Following these principles, the totality of the circumstances certainly provided the experienced law enforcement officers with reasonable suspicion to justify the search of the parcel. Among other things, the investigators had all of the following information: two known informants told law enforcement officers that Defendant was receiving fentanyl through the United States mail; an international package containing fentanyl addressed to Defendant was intercepted months earlier in September of 2017 at J.F.K. International Airport; the package obtained by Inspector Celletti was from a South Korean address and contained a reference to China and the officers understood that these locations in Southeast Asia were areas where illegal fentanyl imported into this country was produced; Defendant's prior criminal history included drug convictions; and, it was confirmed that he owned the P.O. Box listed on the shipping label. (Docket No. 59 at 7-16, 18, 77-78). Taken together, these facts are more than sufficient to demonstrate that the officers had reasonable suspicion that the parcel contained contraband and the same facts also support the heightened finding of probable cause, i.e., a "fair probability that contraband or evidence of a crime" would be found in the package. *Illinois v. Gates*, 462 U.S.

213, 238 (1983).   Accordingly, Defendant's motion is denied insofar as he seeks suppression of the seized package and the quantity of fentanyl analogue removed from within.

Defendant next argues that law enforcement conducted an unlawful warrantless search of his house which led to the seizure of a firearm and drug-related evidence he posits should be suppressed as "fruit of the poisonous tree." (Docket Nos. 47; 70). In response, the Government admits that the S.W.A.T. team conducted a warrantless protective sweep of the residence but maintains that the house was searched and all of the contested evidence was seized under a warrant authorized by Magistrate Judge Kelly.   (Docket Nos. 50; 61).   Defendant essentially argues that the initial warrantless entry for the protective sweep was unlawful and invalidates the later search and seizures undertaken pursuant to the warrant. (Docket No. 70).   Once again, the Court agrees with the Government that the suppression motion must be denied.

The U.S. Court of Appeals for the Third Circuit has held that a protective sweep of a home incident to an arrest made just outside the home may be conducted based upon reasonable suspicion that "the areas being searched may 'harbor an individual' who poses a danger to those present at the scene of the arrest." *White*, 748 F.3d at 511 (quoting *Buie*, 494 U.S. at 344)). The Court of Appeals further noted that a warrantless search of this type is permissible because "[i]t would be imprudent to prohibit officers who are effecting an arrest or waiting until a warrant may be obtained from ensuring their safety and minimizing the risk of gunfire or other attack coming from inside the home if they have reason to believe that dangerous individuals are inside."   *Id.* (quoting *Sharrar v. Felsing*, 128 F.3d 810, 824 (3d Cir. 1997)).

In this Court's opinion, Inspector Celletti credibly explained at the hearing that the three-minute protective sweep was conducted for officer safety because the operational plan was

for officers to secure the residence from the outside while he and others went to the courthouse to apply for a search warrant. (Docket No. 59 at 29-32, 63).   It was thus necessary for their own protection to search the residence so that they could not be attacked from the inside by a criminal associate of Defendant, to the extent one was present. *See White*, 748 F.3d at 511.   While Inspector Celletti candidly admitted that Defendant may have told the other officers that no one was inside the residence, he explained that in his experience officers do not have to take a suspect's word because they often lie to law enforcement officers. (Docket No. 59 at 63).   The Court finds that the protective sweep was reasonable under the totality of the circumstances, particularly in light of the facts that the officers were aware that Defendant was involved in the attempted importation of more than 1 kilogram of fentanyl, suggesting that others may be involved and also had an extensive criminal history including prior convictions for firearms violations, robberies and narcotics offenses.   *See White*, 748 F.3d at 511.

In any event, "[s]uppression of evidence as 'fruit of the poisonous tree' is only justified if 'the challenged evidence is in some sense the product of illegal governmental activity.'" *United States v. Miller*, 267 F. App'x 152, 154 (3d Cir. 2008) (quoting *Segura v. United States*, 468 U.S. 796, 815, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984)) (further quotation omitted).   On the other hand, if the challenged evidence is not the product of illegal governmental activity and was otherwise obtained through lawful means, the exclusionary rule does not apply. *Id.* As the Supreme Court has held:

> evidence discovered during the subsequent search […] pursuant to the valid search warrant issued wholly on information known to the officers before the entry into the apartment need not have been suppressed as 'fruit' of the illegal entry because the warrant and the information on which it was based were unrelated to the entry and therefore constituted an independent source for the evidence.

*Segura*, 468 U.S. at 799 (citation omitted).

Here, there was no evidence introduced at the hearing that the protective sweep resulted in the officers conducting any type of search beyond confirming that no one was inside the residence.   (Docket No. 59 at 29-32, 63).   Additionally, there is no indication that any of the challenged evidence was observed in plain view or seized by the officers during the protective sweep.   (*See* Docket No. 70).   Most importantly, the affidavit supporting probable cause for the search warrant does not rely upon any evidence which was observed during the protective sweep and probable cause was formed based on evidence obtained prior to the officers' entry into the residence.   (Docket No. 50-1).   Therefore, even if the Court had held that the protective sweep was illegally conducted, which it expressly does not, suppression is not an appropriate remedy because the record is uncontested that the challenged evidence was seized under the search warrant.   *See Segura*, 468 U.S. at 799.

### 2.   Probable Cause Supporting the Tracking and Search Warrants

The Court next moves on to Defendant's claim that the tracking and search warrants lack probable cause.   "A magistrate's 'determination of probable cause should be paid great deference by reviewing courts.'" *Illinois v. Gates*, 462 U.S. 213, 236 (1983) (quoting *Spinelli v. United States*, 393 U.S. 410, 419 (1969)). A trial court exercises "only a deferential review of the initial probable cause determination made by the magistrate." *United States v. Conley*, 4 F.3d 1200, 1205 (3d Cir. 1993) (citing *Gates*, 462 U.S. at 236) (emphasis in original). "[T]he duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for ... conclud[ing]' that probable cause existed." *Gates*, 462 U.S. at 238 (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)). The deference given to a magistrate's issuance of a warrant

"does not mean that reviewing courts should simply rubber stamp a magistrate's conclusions." *United States v. Miknevich*, 638 F.3d 178, 182 (3d Cir. 2011). Still, "the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." *United States v. Jones*, 994 F.2d 1051, 1055 (3d Cir. 1993).

A magistrate's role in issuing a warrant is to "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238. A warrant is to be upheld on review "as long as there is a substantial basis for a fair probability that evidence will be found." *Conley*, 4 F.3d at 1205. In conducting this assessment, a reviewing court is confined "to the facts that were before the magistrate judge, i.e., the affidavit, and [the court may] not consider information from other portions of the record." *Jones*, 994 F.2d at 1055. Stated otherwise, the District Court is restricted to viewing only the information confined by the "four corners" of the affidavit before the magistrate. *United States v. Whitner*, 219 F.3d 289, 295-96 (3d Cir. 2000). "The supporting affidavit to a search warrant is to be read in its entirety and in a common sense, nontechnical manner." *Miknevich*, 638 F.3d at 182. This includes "all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information." *Gates*, 462 U.S. at 238-39. Further, "probable cause is a fluid concept that turns on the assessment of probabilities in particular factual contexts not readily, or even usefully, reduced to a neat set of legal rules." *Miknevich*, 638 F.3d at 182 (internal quotations omitted) (quoting *United States v. Shields*, 458 F.3d 269, 277 (3d Cir. 2006)). Proof beyond a reasonable doubt is not required. *Id.*

Defendant argues that the TruNarc results presented to Magistrate Judge Kelly were unreliable and undermine her probable cause findings on both the tracking and search warrants. (Docket No. 70). He raises three alleged issues with the TruNarc results: the dates for the scans conducted on December 6, 2017 were post-dated on December 7, 2017; two of the three scans state "self check passed" while Inspector Celletti testified that the device did not need to be calibrated; and, the third scan alerted positive for butyryl fentanyl while Inspector Celletti admitted that the laboratory tests later indicated that the substance was methoxyacetyl fentanyl. (*Id*.). The Government advocates that the Court uphold the warrants validly issued by a U.S. Magistrate Judge and that the authorized law enforcement actions were undertaken in good faith reliance upon those warrants. (Docket No. 61).

At the outset, a defendant challenging the reliability of information contained within an affidavit carries a heavy burden to show that "the affidavit contained a false statement, which was made knowingly or with reckless disregard for the truth, [and] which is material to the finding of probable cause." *United States v. Yusuf*, 461 F.3d 374, 383 (3d Cir .2006) (citing *Franks v. Delaware*, 438 U.S. 154, 171 (1978)). A warrant may be upheld by a reviewing court if the challenged information is excised from the affidavit and the remaining information continues to support a finding of probable cause for the issuance of the warrant. *See e.g., United States v. Ewell*, No. 13-125, 2016 WL 463784, at *20 (W.D. Pa. Feb. 8, 2016) ("even if the alleged false statements were excised from the affidavits, and/or the omissions were added to same, which the Court expressly holds is not warranted, the remaining information contained within the warrants would still suffice" to demonstrate probable cause for the issuance of the warrant). Applying these legal principles to the parties' disputes, the Court concludes that the

tracking and search warrants are sufficiently supported by probable cause, without consideration of the TruNarc results and that the challenged inaccuracies are otherwise not material to the probable cause determination. (*See* Def. Ex. 1; Docket No. 50-1).

On the former point, it is well settled that "direct evidence" of the existence of contraband or other illegality is not required to demonstrate probable cause of a location to be searched, particularly with respect to the search of a drug dealer's home where contraband is likely to be found. *See e.g., United States v. Stearn*, 597 F.3d 540, 558 (3d Cir. 2010) ("When the crime under investigation is drug distribution, a magistrate may find probable cause to search the target's residence even without direct evidence that contraband will be found there."); *United States v. Gardenhire*, Crim. No. 15-87, 2017 WL 1105733, at *11 (W.D. Pa. Mar. 24, 2017) (citing same). Rather, probable cause may be demonstrated through multiple factors, including: the experience of the officers; information learned from other law enforcement agencies; tips from confidential informants; and other information gleaned from investigative actions. *Id.*

As the Court explains in the preceding section of this Opinion, the totality of the circumstances demonstrates that the officers had probable cause to open the international parcel – prior to the TruNarc device being utilized – and the same information is generally included within the initial affidavit presented to Magistrate Judge Kelly in support of the tracking warrant. *See e.g. Ewell*, 2016 WL 463784, at *20 (citing cases). To reiterate, Inspector Celletti swears to all of the following: his significant experience investigating narcotics and money laundering cases; that parcels placed in the international mail originating in Southeast Asia have been a source for importing fentanyl and its analogues into Pennsylvania; a Pennsylvania State Trooper provided information that Defendant was receiving fentanyl through the U.S. mails; that

Defendant owned a PO Box at the Homestead Post Office; and, an international package from South Korea addressed to Defendant at his Post Office Box was intercepted. (Def. Ex. 1). Beyond such information learned prior to opening the package, the affidavit contains additional information after the package was opened further enhancing probable cause, i.e., Homeland Security Personnel opened the parcel in a controlled environment; the parcel contained a substance which weighed 1,053 grams; and officers determined that agency policies precluded them from using a drug canine to test the substance because the presence of fentanyl was likely. (*Id.*). The affidavit supporting the search warrants issued the next day contains even more detail about the investigation of Defendant and his drug trafficking activities, including the prior interception of an international parcel addressed to him containing fentanyl at J.F.K. in September of 2017. (Docket No. 50-1) All told, the Court finds that if the challenged TruNarc results were not included in the affidavits, they still contain sufficient information to demonstrate probable cause to authorize the use of the GPS and hornet beeper devices and to search Defendant's house and car. *See e.g. Ewell*, 2016 WL 463784, at *20 (citing cases).

Regardless, Defendant's motion also fails because he has not demonstrated that the affidavits contained any false information concerning the TruNarc results or that Inspector Celletti made any false statements concerning same knowingly or with a reckless disregard for the truth. *See Yusuf*, 461 F.3d at 383. First, the discrepancy in the dates on the TruNarc results incorrectly showing that the scans were conducted on December 7, 2017 are insignificant because the document containing the error was presented to Magistrate Judge Kelly as an attachment to the application on December 6, 2017 and she issued the tracking warrant on that day. (*See* Def. Ex. 1). Second, Inspector Celletti's testimony that a TruNarc does not need to

be calibrated does not contradict the results of two of the scans stating "Self Check Passed" as he was not asked to explain the meaning of those results and Defendant presented no other evidence showing that a "self check" is needed to calibrate the device.    (Docket No. 59 at 46-47; Def. Ex. 1).    Third, Defendant did not prove that Inspector Celletti knew that the TruNarc results showing that the substance tested positive was butyryl fentanyl were inaccurate because he did not learn that the substance was methoxyacetyl fentanyl until subsequent laboratory tests were conducted which could not have been provided to Magistrate Judge Kelly.    (*Id*. at 49, 72). Fourth, he also failed to establish that the challenged statement in the affidavit that "[t]he TruNarc device has been proven reliable in identifying the presence of controlled substances on several occasions this year in this district" was false because he presented no evidence establishing that the TruNarc was unreliable in other cases.    (Def. Ex. 1; Docket No. 50-1). The statement is also accurate as to the present case because the TruNarc device identified the presence of controlled substances when Trooper Williams scanned the white powdery substance contained within the parcel addressed to Defendant, as Inspector Celletti explained that both butyryl fentanyl and methoxyacetyl fentanyl are controlled substances. (Docket No. 59 at 48-49). The fact that the laboratory tests are more precise than the field test does not undermine the initial findings of probable cause. (*Id*.).    Finally, the Court alternatively holds that the good faith exception to the warrant requirement applies here because it was reasonable for the involved well-trained law enforcement officers to rely upon the tracking and search warrants dutifully issued by Magistrate Judge Kelly. *See e.g., United States v. Hodge*, 246 F.3d 301, 307-308 (3d Cir. 2001) ("[t]he mere existence of a warrant typically suffices to prove that an officer conducted a search in good faith and justifies application of the good faith exception.").

Accordingly, the Court rejects all of Defendant's arguments challenging the warrants issued in this case.

### B. Fifth Amendment Challenge

With respect to Defendant's claimed Fifth Amendment violation,

> [i]t is the Government's burden to establish that the defendant "'in fact knowingly and voluntarily waived [*Miranda*] rights' when making the statement," by a preponderance of the evidence. *Berghuis v. Thompkins*, 560 U.S. 370, 130 S.Ct. 2250, 2260, 176 L.Ed.2d 1098 (2010) (citing *North Carolina v. Butler*, 441 U.S. 369, 373, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979)). The waiver inquiry has "two distinct dimensions:" it must be "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it" and "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Fahy v. Horn*, 516 F.3d 169, 194 (3d Cir. 2008) (citing *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986)). "[A] heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." *Miranda v. Arizona*, 384 U.S. 436, 475, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

*United States v. Haddix*, No. CRIM. 12-75, 2013 WL 3177749, at *5 (W.D. Pa. June 24, 2013).

> The Supreme Court has made clear that a statement is involuntary when the suspect's "will was overborne in such a way as to render his confession the product of coercion." *Arizona v. Fulminante*, 499 U.S. 279, 288, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). Courts must look at "the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." *Dickerson v. United States*, 530 U.S. 428, 434, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). When viewing the totality of the circumstances, the Supreme Court has identified "some of the traditional indicia of coercion: 'the duration and conditions of detention ..., the manifest attitude of the police toward him, his physical and mental state, the diverse pressures which sap or sustain his powers of resistance and self-control.'" *Colorado v. Spring*, 479 U.S. 564, 574, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987) (citing *Culombe v. Connecticut*, 367 U.S. 568, 602, 81 S.Ct. 1860, 6

L.Ed.2d 1037 (1961)). The Third Circuit has also specified that additional circumstances to consider include the "suspect's background and experience, including prior dealings with the criminal justice system," *United States v. Jacobs*, 431 F.3d 99, 108 (3d Cir. 2005), as well as "the length of the interrogation, its location, its continuity, the defendant's maturity, education, physical condition, and mental health." *Lam v. Kelchner*, 304 F.3d 256, 264 (3d Cir. 2002) (citing *Withrow v. Williams*, 507 U.S. 680, 693, 113 S.Ct. 1745, 123 L.Ed.2d 407 (1993) (some internal citations omitted)).

*Id.* at *6.

On this dispute, the totality of the circumstances persuade the Court that the Government demonstrated by a preponderance of the evidence that Inspector Celletti read Defendant his *Miranda* rights and that, despite being warned that he had the right to remain silent, any statements could be used against him, and he had a right to an attorney, Defendant proceeded to engage in a brief conversation with him during which he made inculpatory statements prior to requesting a lawyer. (Docket No. 59 at 27-30, 61-66, 70). The sole basis for Defendant's challenge is that 15-20 officers were present at the scene with guns drawn but the discussion took place after Defendant had been arrested and placed in a law enforcement vehicle with Inspector Celletti and two other officers, undermining any claim that the situation was unduly coercive. (Docket No. 70). As noted above, Inspector Celletti offered credible testimony to the Court and Defendant did not introduce any evidence countering the Government's straightforward presentation regarding the conversational nature of this discussion. (Docket No. 59 at 27-30; 61-66, 70). The uncontested record further demonstrates that Defendant understood his rights given his significant experience in the criminal justice system and was not under the influence of drugs or alcohol or suffering from any mental health conditions. (*Id.*). His later invocation of his right to an attorney lends further credence to his awareness of his rights and how to properly invoke them.

26

(*Id*. at 28). Hence, the Court concludes that Defendant knowingly and voluntarily waived his *Miranda* rights through his statements to the officers and denies his motion to suppress such statements. *See Haddix*, 2013 WL 3177749, at *5.

V.     CONCLUSION

Based on the foregoing, Defendant's motion to suppress [47] is DENIED. An appropriate Order follows.

s/Nora Barry Fischer
Nora Barry Fischer
Senior U.S. District Judge

Dated: April 6, 2020

cc/ecf: All counsel of record.
        James Folks c/o Linda Cohn, AFPD